An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-179

Filed: 6 October 2015

Rockingham County, No. 12 CVD 1455

KEELIA M. FAIRCLOTH, Plaintiff,

v.

SANDY W. FAIRCLOTH, Defendant.

Appeal by Plaintiff from order entered 25 August 2014 by Judge James A. Grogan in District Court, Rockingham County. Heard in the Court of Appeals 12 August 2015.

> *Schiller & Schiller, PLLC, by Kathryn H. Schiller and David G. Schiller, for Plaintiff-Appellant.*
>
> *No brief filed for Defendant-Appellee.*

McGEE, Chief Judge.

Keelia M. Faircloth ("Plaintiff") appeals from an order granting Sandy W. Faircloth ("Defendant") primary custody of their two children ("the children"). Plaintiff contends, *inter alia*, that the trial court erred by failing to make sufficient findings to support its conclusion that placing the children in Defendant's custody would be in their best interests. We agree.

## I.  Background

Plaintiff and Defendant were married on 16 September 2000.  Plaintiff was served with a divorce petition from Defendant on 15 August 2012.  Plaintiff filed the present action to obtain permanent custody of the children and child support on 17 August 2012.  A temporary custody order was entered on 27 February 2013, granting Plaintiff primary custody and awarding Defendant visitation two weekends each month.  A custody hearing was held on 22 August 2014 ("the custody hearing").

At the custody hearing, the trial court received evidence regarding the dissolution of the marriage between Plaintiff and Defendant.  Although Plaintiff and Defendant owned a house in Stoneville ("the parties' house"), Plaintiff spent significant amounts of time next door at her parents' house ("Plaintiff's parents' house").  According to Defendant, Plaintiff effectively "lived at both residences the whole [thirteen] years" that Plaintiff and Defendant were together.  Defendant testified that, after the children were born, they also stayed with Plaintiff at Plaintiff's parents' house.  Defendant further testified that he regularly asked Plaintiff to "bring the kids home[,]" that he felt like Plaintiff needed to do a better job "balanc[ing] her time," and that Plaintiff's parents had a strong "influence" over her.

In August 2010, Defendant accepted a job in Morehead City, approximately a five-hour drive from the parties' house in Stoneville.  He encouraged Plaintiff to move with the children to be with him.  There was some communication between Plaintiff and Defendant regarding a relocation to the Morehead City area, but Plaintiff

ultimately was unwilling to leave Stoneville, where she had lived all her life. Defendant was unwilling to move back to Stoneville. Unable to resolve the impasse, Plaintiff and Defendant divorced in late 2012.

During the custody hearing, the trial court also received evidence regarding the children's health and behavioral needs. The parties' daughter was born in 2001, at a gestational age of twenty-nine weeks and weighed one pound, two ounces. At the custody hearing, Plaintiff testified that their daughter had been diagnosed with Asperger's Syndrome, Tourette's Syndrome, asthma, oppositional defiant disorder, ADHD, and learning disabilities. She required a feeding tube until 2012 and never lost her baby teeth. At the time of the custody hearing, their daughter was seeing six medical providers and was on numerous medications.

The parties' son was born in 2006, at a gestational age of thirty-three weeks and weighed two pounds, thirteen ounces. At the custody hearing, Plaintiff testified that their son had been diagnosed with autism spectrum disorder, oppositional defiant disorder, ADHD, learning disabilities, speech impairments, mild cerebral palsy, and tachycardia. He required a feeding tube until 2010. At the time of the custody hearing, their son was seeing five medical providers and was on numerous medications.

Plaintiff was the children's primary caretaker from birth until the time of the custody hearing, and Plaintiff testified she had taken the children to all of their

medical appointments. Before accepting the job in Morehead City in 2010, Defendant helped with the children's care when he was not working, but he generally had never been involved with the children's medical appointments.

Plaintiff testified that a primary reason she did not move to the Morehead City area with Defendant was because she did not want to disrupt the children's care with medical specialists near Stoneville. She also was concerned that the children would not adjust well to the move, given their respective behavioral and autism-related diagnoses. Plaintiff further raised concerns that Defendant would not fully attend to the children's medical needs if the children were placed in his custody. Specifically, Plaintiff testified that Defendant believed "there's nothing wrong with" the children and that Defendant had "mentioned that [the children] didn't need" their medication. Plaintiff also questioned Defendant's parenting abilities and claimed that the children's oppositional behavior increased after visits with Defendant.

Plaintiff also testified about daily life with the children when they were in her custody, and she acknowledged that "it's a constant state of [the children] fighting, tearing things up[,]" and their daughter cursing at Plaintiff. Plaintiff acknowledged that, until very recently, their son had not been able to sleep alone and that he had a tendency to run away and hide while in public. By contrast, Defendant testified that the children did not have significant behavioral issues during visits with him and that their son had always been able to sleep alone during visits with Defendant.

Defendant submitted a picture to the trial court of their son sleeping alone at Defendant's house.

Regarding the children's medical care, Defendant testified that he always gave the children their prescribed medication during visits. Defendant also testified he had set up an appointment with a pediatrician close to where he lived, should the court grant custody of the children to him. Defendant was not familiar with other types of medical providers the children were seeing but stated he felt he could obtain whatever services the children needed locally. Defendant also maintained he did not know what medical services his children were receiving because Plaintiff refused to tell him. Plaintiff acknowledged Defendant regularly called to check in, sometimes on a daily basis, but that she would answer the phone only two or three times a month and that she had "nothing to say" to Defendant.

Regarding the children's educational needs, Plaintiff testified that both children had individualized education plans ("IEPs") and that she participated in IEP meetings with school personnel. Plaintiff also submitted training certificates for several special education courses she had taken, and she testified about helping out in their son's classroom the previous year. Plaintiff did acknowledge that the children had each missed over twenty days of school in the past year. However, she asserted that those absences were usually for doctor appointments and pointed out that the school system had not taken any truancy action with regard to the children.

Defendant testified that Plaintiff refused to inform him about the children's progress in school and that he had met with some of the children's teachers recently. He testified he had identified the schools the children would attend if they were in his custody and that he believed he could ensure the children would regularly attend school while in his custody.

During the custody hearing, Defendant also raised concerns regarding the children's living conditions while in Plaintiff's custody. At the time of the hearing, the parties' house had fallen into disrepair and was uninhabitable. In fact, Plaintiff and the children had been living with her mother in Plaintiff's parents' house ever since Defendant moved out in 2010.[1] Plaintiff's parents' house had two bedrooms. However, only one of the bedrooms was usable at the time of the custody hearing. Plaintiff testified that either she, or her mother, would sleep with the children in the usable bedroom and the other would sleep on a recliner in the living room. Plaintiff acknowledged that they had shared the house with five dogs, two cats, and two birds, although several of the pets had recently died.

Defendant testified that he visited Plaintiff's parents' house in 2011 and saw a number of pets, "feces on the floor, . . . litter boxes overflowing, . . . clutter, [and] hoarding." Defendant played a video for the trial court that he claimed he took during that visit and that confirmed his account, although the record does not show the video

---

[1] Plaintiff's father died from cancer in 2007.

was admitted into evidence. Defendant contacted child protective services ("CPS") about the alleged conditions at Plaintiff's parents' house in 2012, although Defendant acknowledged that CPS did not find any significant issues during its subsequent investigation. Plaintiff testified that Defendant contacted CPS immediately after she filed the present action in August 2012, but Defendant stated that he contacted CPS in May 2012. Defendant testified that he may have last visited Plaintiff's parents' house in September 2012, although "[i]t might have been the year before," and he testified that, during that last visit, Plaintiff's parents' house looked uninhabitable, was filled with "filth[ and] spider webs[, and the] animals were allowed to run free."

The parties' daughter also testified at the custody hearing. Because she was only twelve years old, the trial court decided to hear her testimony in the court library, rather than in the courtroom. Although the trial court offered to have the daughter's testimony recorded on a portable transcription device, both Plaintiff and Defendant waived recordation. However, during closing arguments, counsel for Defendant stated that the daughter's testimony about the current state of Plaintiff's parents' house "corroborated every bit" of Defendant's accounts of the house. Counsel for Defendant also asserted that the daughter testified that the children sometimes had to sleep on the floor when they stayed with Plaintiff.

Finally, Defendant testified during the custody hearing regarding his living situation at the time. Defendant was living in a three bedroom house, had remarried,

and had a four-month-old child with his new wife. Defendant stated that the children had their own rooms when they stayed with him. Defendant also introduced a number of pictures of his house, as well as pictures of activities that he, his wife, and the children participated in during the children's visits.

The trial court entered a custody order ("the order") on 25 August 2014, granting Defendant primary custody of the children and awarding Plaintiff periodic visitation. It also ordered that both Plaintiff and Defendant had the right to consult with teachers, school personnel, and medical professionals regarding the children's care. Plaintiff appeals.

## II. Sufficiency of Factual Findings

Plaintiff challenges the sufficiency of the findings in the order. Specifically, Plaintiff contends that the order did not resolve all of the important issues raised during the custody hearing. We agree.

"In child custody determinations, the welfare of the child[ren] is paramount, and the [trial] court must consider all of the facts of the case and decide the issue [of custody] in accordance with the best interests of the child[ren]." *Cunningham v. Cunningham*, 171 N.C. App. 550, 558, 615 S.E.2d 675, 682 (2005) (citation and internal quotation marks omitted); *see* N.C. Gen. Stat. § 50-13.2(a) (2013). "[A] custody order is fatally defective where it fails to make detailed findings of fact from which an appellate court can determine that the [custody] order is in the best interest of the child[ren] . . . [and] when it fails to treat an important question raised by the

evidence." *Dixon v. Dixon*, 67 N.C. App. 73, 76–77, 312 S.E.2d 669, 672 (1984) (citations omitted). "A custody order will also be vacated where the findings of fact are too meager to support the award." *Id.* (citation omitted). "Although a custody order need not, and should not, include findings as to each piece of evidence presented at trial, it must resolve the *material, disputed* issues raised by the evidence." *Carpenter v. Carpenter*, 225 N.C. App. 269, 273, 737 S.E.2d 783, 787 (2013) (emphasis added).

In the present case, the "material, disputed issues[,]" *id.*, regarding the children's welfare centered on: (1) the children's medical, behavioral, and educational needs and the ability of Plaintiff and Defendant to address those needs, (2) the children's ability to adapt to change in the event they were placed in Defendant's custody, and (3) the suitability of the living conditions provided by Plaintiff and Defendant. However, the only findings in the order addressing any of these issues are as follows:

> 5. Both children were born prematurely and have a number of health issues.
>
> 6. From birth until 2010 the children resided with both parties in the marital residence beside [P]laintiff's parents' house. From August 2010 until present the children have resided primarily with [P]laintiff at [Plaintiff's parents'] house.
>
> 7. From birth until 2010 [P]laintiff was the primary caretaker of the children. [D]efendant would help with their care when he was not working but did not attend medical appointments.

. . .

11. [D]efendant has since remarried and lives with his wife and their four month old daughter in Beaufort North Carolina in a three bedroom home.

12. [P]laintiff still lives with her mother. This home is a two bedroom one bathroom home but one of the bedrooms is not useable at this time due to clutter. [The parties' daughter] currently stays in the one usable bedroom with her grandmother. There is a bunk bed in this room. [The parties' son] and [P]laintiff stay in the living room where [P]laintiff sleeps in a recliner and [the parties' son] sleeps [on] the floor.

13. [P]laintiff currently has three dogs, one cat and at least one bird living in the home. There were two additional dogs living in the home but they recently died. There is often feces and urine from these animals on the floor of the home. The home is full of clutter and poorly kept.

14. The marital residence has fallen into disrepair and is currently uninhabitable.

. . .

16. [P]laintiff does not think the children can adapt to the change that would be involved with them going to live with their father but on weekend visits they have done well and have expressed that they would like to live with their father.

These findings barely mention, if at all, the children's medical, behavioral, and educational needs and the ability of Plaintiff and Defendant to address those needs, all of which were strongly contested during the custody hearing. Accordingly, we are

unable to "determine that the order [was] in the best interest of the child[ren]" and must vacate the order of the trial court. *Dixon*, 67 N.C. App. at 76–77, 312 S.E.2d at 672. We also remand so that the trial court can enter an order addressing all of the "material, disputed issues" that were raised at the custody hearing. *Carpenter*, 225 N.C. App. at 273, 737 S.E.2d at 787. Because we vacate the trial court's order, we need not consider Plaintiff's additional challenges on appeal.

VACATED AND REMANDED.

Judges HUNTER, JR. and DAVIS concur.

Report per Rule 30(e).